IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

WILLIAM DIERKER, *et al.*,                    *

    Plaintiffs,                          *

       v.                               *          CIVIL NO.: WDQ-11-0091

EAGLE NATIONAL BANK,                          *

    Defendant.                           *

*   *   *   *   *   *   *   *   *   *   *   *   *

MEMORANDUM OPINION

William Dierker and Clear Summit Mortgage ("CSM") sued
Eagle National Bank ("Eagle") for fraud and other claims.  For
the following reasons, the Court will deny Eagle's motion for
summary judgment.[1]

I. Background[2]

Dierker has worked in the mortgage industry since 2003.[3]  In
June 2008, he established CSM, a mortgage brokerage firm in
Columbia, Maryland.  William Dierker. Dep. 33:3-7, Jan. 26,
2012.  Dierker was the sole shareholder of CSM.  *Id.* 70:15-18.

Eagle is a federally-chartered bank.  ECF No. 35 at 2.

---

[1] The Court will grant the Plaintiffs' unopposed motion to file a
surreply, ECF No. 44.

[2] For Eagle's motion for summary judgment, the Plaintiffs'
evidence "is to be believed, and all justifiable inferences are
to be drawn in [their] favor."  *Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 255 (1986).

[3] ECF No. 35, Ex. E (William Dierker résumé).  Dierker has worked
as a loan officer and manager.  *Id.*

Eagle Nationwide Mortgage Company ("ENMC") is a wholly-owned subsidiary of Eagle. *Id.*

In 2009, ENMC employees provided mortgage loans at Eagle branches throughout the country. ECF No. 35 at 2. Branches had two options for processing loans. *Id.* The branches could "broker" a loan by sending it to a third-party investor, which would underwrite the loan with its own funds. Dierker Dep. 24:10-13. Alternatively, the branches could "bank" a loan by lending money directly from branch funds. *Id.* 23:20-24:7.

CSM brokered all the loans it originated. Dierker Dep. 36:8-12. In 2009, Dierker decided to move CSM's mortgage lending business to a federally chartered bank to (1) originate loans from all 50 states under a single federal mortgage license, and (2) generate more revenue by banking loans instead of brokering them. Dierker Dep. 57:3-58:21, 83:2-84:17, 89:11-90:21.

In October 2009, Dierker inquired through Eagle's website about converting CSM into an Eagle branch. *Id.* 62:9-12. Thereafter, Dierker exchanged emails with Eagle recruiter Sheila Morelli, and the two spoke on the phone "pretty regular[ly]." *Id.* 62:21-64:1. Dierker "made it crystal clear from the beginning that [his] intention was to bank 100 percent" of the loans he originated. *Id.* 136:14-16.

At the time Dierker was considering a relationship with

Eagle, he knew that many banks were failing, being sold, or merging with other banks. Dierker Dep. 154:6-16. "Banks were unwilling to make real estate loans on anything that didn't carry a government-backed guarantee," because "[t]here was a lot of scrutiny and finger-pointing . . . to find out what caused the mortgage [and] real estate collapse." *Id.* 109:15-110:17.

By October or November 2009, Eagle's mortgage division president, Sam Morelli, knew that Eagle "wanted to sell or close or somehow get rid of the mortgage division." Sam Morelli Dep. 16:18-25, Jan. 17, 2012.

On November 3, 2009, Dierker applied to open an Eagle branch. Dierker Dep. 9:18-10:10, 68:9-16, 70:6-15. The application stated that CSM intended to process about $12 million in loans each month--about 80 $150,000 loans. *Id.* 134:8-19. CSM produced a spreadsheet of loans in its "pipeline"; the spreadsheet did not show whether the loan applicants would qualify for a loan. *Id.* 122:12-125:6.

On December 9, 2009, Dierker met with three Eagle representatives: Sheila Morelli, Sam Morelli, and Kevin Schaen, who was "in charge of the branches in operation." Dierker Dep. 67:16-68:8. When Dierker asked if Eagle could bank 100 percent of CSM's loans, Sam Morelli responded with a "mocking type of tone that said, 'as we're a federally chartered bank, we can handle whatever volume you could potentially bring.'" *Id.*

3

131:8-22.  He was "overly confident almost to the point of cocky," and "said that it would be no problem, that [Eagle] could handle all the volume."  *Id.* 134:4-6, 142:14-143:2. "[N]obody . . . indicated that there was any concern whatsoever that the volume [CSM would] deliver[] would be a problem."  *Id.* 133:6-8.  Sheila Morelli and Schaen nodded their heads and did not contradict Sam Morelli's representations.  *Id.* 133:3-16. Dierker, who had been "leaning towards" a relationship with Eagle, "gained comfort" that Eagle "could handle [CSM's] banking needs."  *Id.* 72:15-73:15.  His decision to work with Eagle "was sealed" after the meeting.  *Id.* 72:3-4.

Sheila Morelli told Dierker that, to become an Eagle branch, CSM "needed two months' operating expenses set up as a reserve."  Dierker Dep. 167:14-168:6; Dieker Aff. ¶ 5.  Because Dierker could not personally afford to make the deposit, Eagle agreed to accept "the full amount of the proceeds of [CSM's] wind down," which "was payable directly to [Dierker] as [CSM's] 100 [percent] owner."  William Dierker Aff. ¶ 4.  Dierker transferred $128,000 "from the [CSM] account and put it into [his] personal account and cut the check from there."  Dierker Dep. 169:21-170:2.  The $128,000 was "profit for CSM that [Dierker] had not yet distributed"; "had Eagle not requested the funds," Dierker would have kept them.  Dierker Aff. ¶ 6.

On February 1, 2010, CSM began operating as an Eagle

4

branch.[4]   In March 2010, CSM stopped originating loans, "began

the wind-down," and surrendered licenses.  Dierker Dep. 38:7-

39:3.  On March 4, 2010, Sam Morelli sent the following email to

Eagle department leaders:

> For a couple of months now we have tried to increase
> our share of our loan closing from brokered to banked
> and have been unsuccessful.  Knowing that volumes were
> reducing we needed to obtain a much larger share on
> the banked side in order to keep income at a level to
> cover current expenses.  As we are aware, we live off
> of our volumes and we have significantly reduced
> volume levels for January and February.  That trend is
> continuing   and   therefore   our   expenses   are
> unsustainable.  Kindly be prepared to discuss cutting
> your department expenses to [half] of current levels
> until we can move the platform to an arena where we
> have the opportunity to rebuild it.  All expenses are
> in the mix.

Opp'n to Mot. for Summ. J., Ex. 7.  When he sent the email, Sam

Morelli knew "that we would be sold."  Sam Morelli Dep. 48:24-

29:5.

In mid-March 2010, Sheila Morelli called Dierker "to give

[him] a heads-up that [Eagle's] mortgage division was being

listed for sale."  Dierker Dep. 149:5-12.  Although no one had

told Dierker that the mortgage division would not be sold, he

was "complete[ly] surprise[d]."  *Id.* 149:20, 152:10-14.

Former CSM employees found that Eagle's understaffing

---

[4] *See* Dierker Dep. 87:14-15.  The parties had no written
contract.  *Id.* 161:9-17.  Dierker asserts that "it was
understood that [a CSM employee] [would be] interim branch
manager; it [would be] [Dierker's] branch, and [Dierker] would
be entitled to all the revenues derived from that branch."  *Id.*
162:2-6.

delayed loan processing. Opp'n to Mot. for Summ. J., Ex. 9 (CSM Employee Affidavits). Many customers, frustrated with the delays, withdrew their loan applications. *Id.* Employees who had completed 35 percent of the loans they originated at CSM completed only 17 percent at Eagle. *Id.*, Ex. 2 at 2-3 (Answer to Interrogatory No. 10).

In late May 2010, Dierker decided that his business should stop operating as an Eagle branch. Dierker Dep. 182:10-20. In May and June 2010, the former CSM employees left Eagle.[5]

On November 30, 2010, Dierker sued Eagle in the Circuit Court for Howard County, seeking more than $1 million in damages for fraud, negligent misrepresentation, unjust enrichment, and constructive fraud. ECF No. 2. On December 14, 2010, Dierker served the complaint and summons on Eagle. ECF No. 1 at ¶ 5. On January 11, 2011, Eagle removed to this Court on the basis of diversity jurisdiction.[6]

On March 28, 2011, Dierker amended the complaint to (1) add

---

[5] *See* Opp'n to Mot. for Summ. J., Ex. 8. Dierker never became an Eagle branch manager. Dierker Dep. 215:15-19. He had planned to join Eagle only after "the pipeline [of loans] at [CSM] had been fully resolved." *Id.* 215:20-216:1.

[6] ECF No. 1; 28 U.S.C. § 1332. Dierker is a citizen of Maryland. Am. Compl. ¶ 2. Eagle is a citizen of Pennsylvania, where its headquarters is located. *See* ECF No. 1 at ¶ 3; 28 U.S.C. § 1348 ("national banking associations shall . . . be deemed citizens of the States in which they are . . . located"); *MBIA Ins. Corp. v. Royal Indem. Co.*, 294 F. Supp. 2d 606, 611 (D. Del. 2003) (national banking association was "located" in Minnesota, its principal place of business).

CSM as a plaintiff, and (2) include a claim for detrimental reliance. ECF No. 18. On April 11, 2011, Eagle filed its answer and counterclaimed for negligent misrepresentation and unjust enrichment. ECF No. 19.

In response to Eagle's interrogatories, Dierker said that CSM lost about $644,000 in total revenue because of the "precipitous decline" in its loan conversion rate after CSM became an Eagle branch. ECF No. 35, Ex. F at 7. Dierker stated that, before joining Eagle, CSM earned about $4,000 per loan, and generally completed about 35 percent of the loans that it processed. *Id.* At Eagle, CSM employees processed 897 loans but completed only 153 (about 18 percent fewer than before). *Id.* Thus, to calculate the $644,000 damages figure, Dierker took 18 percent of 897[7] and multiplied it by $4,000. *Id.* Dierker also claimed as damages the $128,000 he paid Eagle as a security deposit. *Id.*

On March 5, 2012, Eagle moved for summary judgment on all of the Plaintiffs' claims. ECF No. 35. On May 11, 2012, the Plaintiffs opposed the motion.[8] On May 29, 2012, Eagle filed a reply. ECF No. 43. On June 28, 2012, the Plaintiffs filed a surreply. ECF No. 44.

---

[7] Dierker rounded that figure--161.46--down to 161. *See* ECF No. 35, Ex. F at 7.

[8] ECF No. 42. The opposition was timely. *See* ECF No. 41 (order granting more time to file opposition).

II. Analysis

  A. Standard of Review

    Under Fed. R. Civ. P. 56(a), summary judgment "shall [be] grant[ed] . . . if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In considering a motion for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

    The Court must "view the evidence in the light most favorable to . . . the nonmovant[s]," and draw all reasonable inferences in their favor, *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court also "must abide by the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003).

  B. Eagle's Motion

    Eagle argues that it is entitled to summary judgment on each of the Plaintiffs' claims.

8

1. Fraud and Detrimental Reliance[9] (Counts I and V)

To establish fraud, a plaintiff must show that

> (1) the defendant made a false representation to the plaintiff, (2) the falsity of the representation was either known to the defendant or the representation was made with reckless indifference to its truth, (3) the misrepresentation was made for the purpose of defrauding the plaintiff, (4) the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) the plaintiff suffered compensable injury as a result of the misrepresentation.

*Hoffman v. Stamper*, 867 A.2d 276, 292 (Md. 2005).[10]

Under the doctrine of detrimental reliance, a promise is binding if "the promisor should reasonably expect [the promise] to induce action or forbearance on the part of the promisee, "does induce such action or forbearance," and injustice can be avoided only by enforcement of the promise." *Pavel Enters. v. A. S. Johnson Co.*, 674 A.2d at 529 n.18 (*quoting Restatement (Second) Contracts* § 90(1)). To establish detrimental reliance, a plaintiff must show, *inter alia*, "a clear and definite promise" and reasonable reliance. *See id.* at 532.

Eagle argues that it is entitled to summary judgment on the

---

[9] Although the parties' briefs refer to Count V as a claim for "promissory estoppel," the count is titled "detrimental reliance," *see* Am. Compl. 11, which "more clearly expresses the concept intended." *See Pavel Enters. v. A. S. Johnson Co.*, 674 A.2d 521, 523 n.1 (Md. 1996).

[10] Fraud may also consist of "a suppression of the truth," *see Hoffman*, 867 A.2d at 292 n.12 (internal quotation marks omitted), but the Plaintiffs allege only affirmative misrepresentations in their fraud claim. *See* Am. Compl. ¶¶ 32–38.

Plaintiffs' fraud claim because the only representations it made were "non-actionable sales talk," upon which the Plaintiffs did not rely.  ECF No. 35 at 2.  Eagle argues that the detrimental reliance claim fails for the same reason: "the lack of clear, definite promises and reasonable reliance on such promises." *Id.* at 17.

a. Actionable Misrepresentations

"To be actionable, misrepresentations must be material to the transaction at issue."  *Rozen v. Greenberg*, 886 A.2d 924, 930 (Md. Ct. Spec. App. 2005).  "In Maryland, only a false statement concerning a present or past event may undergird a claim for fraud[.]"[11]  As a "general rule,"

> a cause of action in fraud [cannot] be predicated on statements as to future events, as to expectations and probabilities, as to what will be or is intended to be done in the future, or mere expressions of opinion about what will occur in the future."[12]

A statement about future events may support a claim for fraud "if it relates to matters within the speaker's exclusive control, rather than an expectation or prediction."[13]

---

[11] *Abercrombie v. Nationwide Mut. Ins. Co.*, 999 F. Supp. 660, 663 (D. Md. 1998) (*citing Weisman v. Connors*, 540 A.2d 783, 796 (Md. 1988)).

[12] *Weisman*, 540 A.2d at 796 (internal citation and quotation marks omitted).

[13] *Abercrombie*, 999 F. Supp. at 664 (because the plaintiff's immediate supervisors had no "authority to grant, change, or eliminate [his] grandfather status" under a company policy

Moreover, a "prediction that the declarant never believes will come true" may show that the statement was "made for purposes of defrauding the victim."[14]  Thus, a defendant commits fraud when he "induces another to part with his money or property by means of a promise which [the defendant] makes with the [present] intention of not performing it."[15]  Fraud may also arise if an official says that his company is "expected to continue its . . . operation well into the future" and have "enough work to keep [its] plant operating," when the official knows "that the plant [will] be closed or that there [will] not be enough work to keep it afloat."  *Miller v. Fairchild Indus., Inc.*, 629 A.2d 1293, 1302-03 (Md. Ct. Spec. App. 1993).

A statement is not actionable in fraud if it is "vague and indefinite," because "such statements are deemed to put the party to whom they are made on inquiry notice to investigate

banning the private practice of law, their statement that he was "grandfathered" and could practice privately could not support a fraud claim).

[14] *See Onusko v. JP Morgan Chase Bank, N.A.*, 824 F. Supp. 2d 635, 640-43 (D. Md. 2011) (defendant bank did not commit fraud when it told the plaintiff that it would "dedicate resources to her division" and "allow her to hire [a] 350-person sales team" but did not foresee the collapse of the subprime mortgage industry and resulting hiring freezes).

[15] *Appel v. Hupfield*, 84 A.2d 94, 97 (Md. 1951), *quoted in First Union Nat'l Bank v. Steele Software Sys. Corp.*, 838 A.2d 404, 426 (Md. Ct. Spec. App. 2003).  *See also Weisman*, 540 A.2d at 795-96 (defendant's statements that plaintiff "would have broad executive responsibility," and defendant would not be general manager were "statements of [defendant's] present intention").

further."  *Lasater v. Guttmann*, 5 A.3d 79, 103 (Md. Ct. Spec.
App. 2010) (internal quotation marks omitted).  Nor can a fraud
claim arise out of opinions[16] or mere puffery--statements that
are "extravagant in scope and measure" and "elusive in
meaning."[17]

The Plaintiffs assert that Eagle made several actionable
misrepresentations, including statements that "its operations
department could handle the volume" of loans originated by CSM.
Am. Compl. ¶ 33; ECF No. 42 at 8.  Eagle counters that the

---

[16] *See, e.g.*, *Parker v. Columbia Bank*, 604 A.2d 521, 528 (Md. Ct.
Spec. App. 1992).

[17] *See Milkton v. French*, 150 A. 28, 32-32 (Md. 1930) (seller's
statement that a home "was perfectly safe" because he had built
it himself was mere puffery, not an actionable misrepresenta-
tion, because it was "extravagant in scope and measure,"
"indefinite and elusive in meaning," and "[n]obody places trust
in a representation based upon self-praise so general and
comprehensive"), *quoted in First Union Nat'l Bank*, 838 A.2d at
442-43 (defendant's statements about a "long term mutually
beneficial relationship," "long term relationship," "long term
partners," and claim that, "as we grow, you'll grow," were not
actionable because they had "no concrete terms, and [were]
general statements of expectation or opinion").  *See also Baney
Corp. v. Agilsys NV, LLC*, 773 F. Supp. 2d 593, 609 (D. Md. 2011)
(defendant's statement that a program would be "easy to use and
perfect for a multi-property environment" was "mere puffery");
*Steigerwald v. Bradley*, 136 F. Supp. 2d 460, 469-70 (D. Md.
2001) (loan officer's statements that the defendant was one of
the bank's "biggest and best customers" was puffing); *McGraw v.
Loyola Ford, Inc.*, 723 A.2d 502, 512 (Md. Ct. Spec. App. 1999)
(dealer's statements that a car was "the most outstanding value"
on the lot and "[e]very consideration in pricing and/or trade in
allowance ha[d] been given to reduce the . . . price to its
lowest" were puffery, not "actionable representations"), *cert.
denied*, 727 A.2d 382 (Md. 1999).

alleged misrepresentations were not actionable because they were "puffing and forward-looking." ECF No. 35 at 15.

A jury could reasonably find that Sam Morelli knew, when he told Dierker that Eagle "could handle all the volume" that CSM originated,[18] that the bank had no intention or ability to do so. Sam Morelli knew a month before he made the statement that Eagle wanted to "get rid of the mortgage division." *See* Sam Morelli Dep. 16:18-25. From his March 4, 2010 email, a jury could also find that Sam Morelli knew that Eagle had not been closing as many loans as it had hoped, and would need to cut expenses.[19] Although Sam Morelli's statements to Dierker referred to future events, a jury could reasonably find that they were a "predict-tion that [he] never believe[d] w[ould] come true,"[20] much like a plant official's statement that business "will continue . . . well into the future" when he knows that "the plant [will] be closed."[21]

Although Sam Morelli was "overly confident almost to the point of cocky," *see Id.* 134:4-6, his statements were not

---

[18] *See* Dierker Dep. 134:4-6, 142:14-143:2.

[19] *See* Opp'n to Mot. for Summ. J., Ex. 7 (March 4, 2010 email noting that, "[f]or a couple of months," Eagle had known "that volumes were reducing," and that "expenses [would be] unsustainable").

[20] *See Onusko*, 824 F. Supp. 2d at 640-43.

[21] *See Miller*, 629 A.2d at 1302-03.

puffery, because they were neither "extravagant in scope and measure" nor "elusive in meaning." *See Milkton*, 150 A. at 32-32.  Dierker had made clear that CSM intended to process about 80 loans a month--totaling about $12 million--and that he wanted to bank all the loans.  *See* Dierker Dep. 134:8-19, 136:14-16. Sam Morelli told Dierker that Eagle was capable of banking that volume.  *See id.* 134:4-6, 142:14-143:2.  A jury could reasonably find that Sam Morelli's representations were a sufficiently clear and definite promise that Eagle could--and intended to-- process that volume.  *See Pavel Enters.*, 674 A.2d at 532.

Because Sam Morelli's statements were not puffery, and there is a genuine dispute about whether he knew Eagle could not process CSM's volume of loans, Eagle has not shown that the statements are not fraudulent.  Eagle has also not shown the lack of a clear and definite promise for recovery for detrimental reliance.

b. Reliance

"A party is justified in relying on another's factual assertions unless . . . the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived," in which case "he is required to make an

investigation of his own."[22]   "In determining if reliance is
reasonable, a court is required to view the act in its setting,"
*see Sass v. Andrew*, 832 A.2d at 247, 267 (Md. Ct. Spec. App.
2003), and consider such factors as "the background and
experience of the party that relied upon the representation."[23]

Eagle argues that the Plaintiffs could not have reasonably
relied on its alleged misrepresentations because they knew that
"Eagle was not in a position to categorically state that CSM's
traditional borrowers could be funded in the Eagle system";
Dierker had provided Eagle "only summary data regarding CSM's
loan pipeline," not "prospective borrower information,
creditworthiness, and similar information to allow Eagle to
determine whether the prospective borrowers would meet the
lender qualifications of Eagle and its third-party lending
partners."   ECF No. 35 at 15.   Eagle further contends that
Dierker was already "leaning" toward a relationship with Eagle
before Sam Morelli's December 9, 2009 statements.   *Id.*

The Plaintiffs counter that they provided Eagle all the

---

[22] *Moseman v. Van Leer*, 263 F.3d 129, 132 (4th Cir. 2001), *citing
Gross v. Sussex Inc.*, 630 A.2d 1156, 1166 (Md. 1993).

[23] *See Goldstein v. Miles*, 859 A.2d 313, 333 (Md. Ct. Spec. App.
2004) (plaintiffs did not reasonably rely on the defendant's
representations because they "were lawyers with many years of
practice under their respective belts" and it was "inconceiv-
able" that "experienced lawyers" would have relied on such
"nebulous" and "vague" representations, "especially in the
context of a million dollar deal").

information that it had requested.  ECF No. 42 at 13.  They further contend that Sam Morelli's statements "caused CSM to join Eagle."  *Id.*

Eagle has failed to show that the Plaintiffs unreasonably relied on its representations that it could bank $12 million in loans per month.  *See* Dierker Dep. 134:4-19, 142:14-143:2.  That Eagle may have assumed that many applicants would not have qualified for loans does not absolve it from misrepresenting that it *could have* banked all the loans for which CSM had applications.  Nor does it explain how CSM or Dierker could have--or should have--known that some of the applicants would not qualify for loans under Eagle's guidelines.[24]  Dierker's willingness to deal with Eagle before the December 9, 2009, meeting[25] does not negate his reliance on Sam Morelli's statements; Dierker testified that the decision to work with Eagle was not "sealed" until after the meeting.  *See* Dierker Dep. 72:3-4.

Because Eagle has not shown that its statements were not actionable, or that the Plaintiffs' reliance was unreasonable, Eagle is not entitled to summary judgment on the Plaintiffs'

---

[24] Although Dierker had substantial experience in the mortgage industry, *see* ECF No. 35, Ex. E, he had never worked for Eagle. Notably, his question to Sam Morelli related to the volume of loans Eagle could process, *see* Dierker Dep. 131:8-22, not the likelihood that every loan application would be accepted.

[25] *See* Dierker Dep. *Id.* 72:15-73:15.

16

fraud claim.  The Court must also deny summary judgment on the detrimental reliance claim, because the Plaintiffs have raised a genuine dispute about whether there was a clear and definite promise, and reasonable reliance on that promise.

2. Negligent Misrepresentation and Constructive Fraud
    (Counts II and IV)

The Plaintiffs allege that Eagle committed negligent misrepresentation by making "several false representations" and omissions to induce them to join Eagle.  *See* Am. Compl. ¶ 41. They allege that Eagle committed constructive fraud by "creat[ing] a relationship of trust and confidence with [the] Plaintiffs . . . to cause them to fold CSM's business operations into Eagle" when "Eagle knew . . . that it lacked the necessary staff to process and underwrite the volume of loans originated through CSM's former employees." *Id.*  ¶¶ 51-52.

Eagle argues that both claims "fail for lack of any legal duty" because the Plaintiffs have alleged only an economic loss but no "intimate nexus between the parties."  ECF No. 35 at 16 (internal quotation marks omitted).

To establish negligent misrepresentation, a plaintiff must show that

> (1) the defendant, owing a duty of care to the plaintiff, negligently assert[ed] a false statement;
> (2) the defendant intend[ed] that [its] statement [would] be acted upon by the plaintiff; (3) the defendant ha[d] knowledge that the plaintiff [would]

17

> probably rely on the statement, which, if erroneous,
> [would] cause loss or injury; (4) the plaintiff,
> justifiably, [took] action in reliance on the
> statement; and (5) the plaintiff suffer[ed] damage
> proximately caused by the defendant's negligence.

*Lavine v. Am. Airlines, Inc.*, Case No. 2917, ---A.3d---, 2011 WL
6003609, at *4 (Md. Ct. Spec. App. Dec. 1, 2011).

Constructive fraud is a "breach of a legal or equitable
duty which, irrespective of the moral guilt of the fraud feasor,
the law declares fraudulent because of its tendency to deceive
others, to violate public or private confidence, or to injure
public interests." *Canaj, Inc. v. Baker and Division Phase III,
LLC*, 893 A.2d 1067, 1095 (Md. 2006) (internal quotation marks
omitted).

Although "[t]here is no precise formula for determining the
existence of a duty of care between two parties," a plaintiff
who claims economic loss from negligent representation must show
an "intimate nexus" through "contractual privity or its
equivalent." *Griesi v. Atl. Gen. Hosp. Corp.*, 756 A.2d 548, 554
(Md. 2000). "Arms-length negotiations between representatives
of commercial entities do not establish an intimate nexus unless
they invoke considerations of personal trust and reliance."
*Sagent Tech., Inc. v. Micros Systems, Inc.*, 276 F. Supp. 2d 464,
471-72 (D. Md. 2003).

> [T]he relationship of the parties . . . must be such
> that in morals and good conscience the one has the
> right to rely upon the other for information, and the

18

other giving the information owes a duty to give it with care.

*Griesi*, 756 A.2d at 554 (*quoting Int'l Prods. Co. v. Erie R. Co.*, 155 N.E. 662, 664 (N.Y. 1927)).  Courts applying Maryland law have found an intimate nexus between parties who have engaged in detailed, months-long business negotiations,[26] or contemplated a long-term relationship.[27]  Courts have also considered whether the party making the alleged misrepresentation "had exclusive control over material information necessary for [the other party] to understand the situation,"[28] and whether the defendant's "promises were an inducement to the plaintiff

---

[26] *Compare Baltimore County v. Cigna HealthCare*, 238 F. App'x 914, 923 (4th Cir. 2007) (intimate nexus may exist after "detailed and extensive communications" between the parties) *and Giant Food, Inc. v. Ice Kind, Inc.*, 536 A.2d 1182, 1185 (Md. Ct. Spec. App. 1988) (intimate nexus was established when a supermarket and an ice supplier negotiated for seven months about, *inter alia*, the type, price, and quantity of ice to be supplied; the delivery terms; and where the ice supplier should build an ice plant to be convenient to the supermarket), *with Sagent*, 276 F. Supp. 2d at 472 ("routine sale of computer software" did not invoke "considerations of personal trust and reliance").

[27] *Compare Giant Food, Inc.*, 536 A.2d at 1185 (intimate nexus established when ice supplier and supermarket discussed a long-term relationship), *with Omni Jet Trading, Inc. v. Heerensperger*, 121 F.3d 699 (table), 1997 WL 543381, at *5 (4th Cir. Sept. 5, 1997) (no intimate nexus established when aircraft sales company served as a "one-time potential broker").

[28] *Odyssey Travel Ctr., Inc. v. RO Cruises, Inc.*, 262 F. Supp. 2d 618, 628 (D. Md. 2003).  *See also Griesi*, 756 A.2d at 556 (intimate nexus existed when, *inter alia*, prospective employer "had exclusive control of vital and material information" about potential job openings, which was "necessary for [the prospective employee] fully to understand the situation").

and provided the defendant with a business advantage when the
plaintiff acted in conformance with them."[29]

To establish constructive fraud, a plaintiff must show a
breach of a "legal or equitable duty." *See Canaj, Inc.*, 893
A.2d at 1095. Although the tort often involves the breach of a
fiduciary duty,[30] no authority bars a constructive fraud claim on
the basis of a legal duty of care under negligence principles.[31]
Thus, if a reasonable jury could find that Eagle owed the
Plaintiffs a duty of care, there is a genuine dispute about
whether the Plaintiffs have established a legal duty necessary
for their constructive fraud claim.

A reasonable jury could find that Eagle owed a duty of
care. Dierker testified that he exchanged several emails with
Eagle recruiter Sheila Morelli, and spoke with her by phone
"pretty regular[ly]" beginning in October 2009; on November 3,

---

[29] *Cooper v. Berkshire Life Ins. Co.*, 810 A.2d 1045, 1062 (Md.
Ct. Spec. App. 2002). *See also L & P Converters v. Alling &
Cory Co.*, 642 A.2d 264, 268 (Md. Ct. Spec. App. 1993) (intimate
nexus existed when, *inter alia*, customer had asked seller for
paper of a certain quality, seller had represented that the
paper met the requested specifications when it did not, and
seller had known that the customer needed paper of the requested
specifications in order to bid on a job).

[30] *See Alleco Inc. v. Harry & Jeannette Weinberg Found., Inc.*,
665 A.2d 1038, 1049 n.6 (Md. 1995) (constructive fraud "usually
arises from a breach of duty where a relationship of trust and
confidence exists").

[31] *See, e.g., Jones v. State*, 38 A.3d 333, 343 (Md. 2012) (duty
of care necessary to prove negligence is a legal duty).

2009, Dierker applied to open an Eagle branch; and on December
9, 2009, he met with three Eagle representatives to further
discuss converting CSM into an Eagle branch. *See* Dierker Dep.
9:18-10:10, 62:21-64:1, 68:9-16, 70:6-15, 134:8-19.  Such
lengthy negotiations, about forming a long-term relationship,
may show that the parties had an intimate nexus. *See, e.g.,*
*Giant Food, Inc.*, 536 A.2d at 1185.  Eagle also had exclusive
control over information--Eagle's ability to process a certain
volume of loans--that Dierker needed to understand the situation
and decide whether to convert CSM into an Eagle branch. *See*
*Odyssey Travel Ctr., Inc.*, 262 F. Supp. 2d at 628.  Dierker
further testified that, because of Eagle's representations, CSM
started to surrender licenses, and Dierker gave Eagle his
$128,000 in "wind-down proceeds."  Dierker Dep. 38:7-39:3, 72:3-
4; William Dierker Aff. ¶¶ 4-5.  Thus, a jury could reasonably
find that Eagle's representations "were an inducement to the
[Plaintiffs] and provided [Eagle] with a business advantage when
the [Plaintiffs] acted in conformance with them." *See Cooper,*
810 A.2d at 1062.

Because there is a genuine dispute about whether Eagle had
a legal duty of care to the Plaintiffs, the Court must deny
Eagle's motion for summary judgment on Counts II and IV.

3. Damages

Eagle argues that it is entitled to summary judgment on all

21

counts because the Plaintiffs' requested damages are "speculative and unrecoverable." ECF No. 35 at 18.

CSM claims it lost about $644,000 in total revenue because of the "precipitous decline" in its loan conversion rate after CSM became an Eagle branch. ECF No. 35, Ex. F at 7. Dierker also seeks to recover the $128,000 he paid Eagle as a security deposit. *Id.*

Eagle argues that (1) the Plaintiffs "must choose either benefit-of-the-bargain damages or the 'actual loss' [$128,000] out-of-pocket expenses," but "cannot recover both" in their fraud and misrepresentation claims; (2) neither Dierker nor CSM can recover the $128,000 that Dierker paid Eagle as a security deposit; and (3) the Plaintiffs' calculation of lost profits is based on "flawed methodology." ECF No. 35 at 18-20.

a. Damages for Fraud and Misrepresentation

In fraud and deceit cases, a plaintiff may recover "out-of-pocket" expenses (i.e., the plaintiff's actual losses) or "benefit-of-the-bargain" damages, which "put[] the defrauded party in the same financial position as if the fraudulent representations had in fact been true." *Goldstein*, 859 A.2d at 324 (internal quotation marks omitted). Benefit-of-the-bargain damages require the plaintiff to show that a bargain existed. *Id.* A plaintiff's actual loss is determined by the fact-finder. *AGV Sports Grp., Inc. v. Protus IP Solutions, Inc.*, 10 A.3d 745,

752 (Md. 2010).

Eagle argues that the Plaintiffs impermissibly seek both types of damages, and have not shown a bargain necessary to recover benefit-of-the-bargain damages. *See* ECF No. 35 at 18-19. The Plaintiffs counter that they seek only actual losses: "damages associated with what [they] would have earned (and/or not paid to [Eagle]) if [they] had never relied on the misrepresentations and joined Eagle." ECF No. 42 at 25. They argue that their actual losses "include the $128,000 [that Dierker paid as a security deposit] as well as the profits they would have made" had they not converted CSM to an Eagle branch. *Id.*

Eagle is not entitled to summary judgment, because the Plaintiffs seek only actual losses, which are recoverable in fraud cases. *Goldstein*, 859 A.2d at 324. Whether the amount the Plaintiffs seeks is accurate is a question for the fact-finder, *see AGV Sports Grp., Inc.*, 10 A.3d at 752, not one for the Court to resolve upon a motion for summary judgment.

  b. Recoverability of the $128,000 Security Deposit

Eagle argues that the $128,000 security deposit is not recoverable. *See* ECF No. 35 at 19. Eagle contends that Dierker has no claim to the money because it belonged to CSM: Dierker "obtained the funds from CSM's bank account," "merely transferred the funds to his personal bank account," and "a sole

23

shareholder does not have standing to assert claims alleging wrongs to the corporation." *See* ECF No. 35 at 10, 19. Eagle argues that CSM cannot recover the money because CSM did not suffer a loss: the $128,000 "benefitted the business" and "would have been spent on the same operational expenses . . . if the CSM operations had not transitioned to Eagle." *See id.* at 19.

The Plaintiffs counter that Dierker has a claim to the $128,000 because it "represented profit for CSM" that "would have gone to . . . Dierker had CSM not transitioned to Eagle." ECF No. 42 at 21. They argue that CSM has a claim to the money because the $128,000 was paid to Eagle for "an operation that did not benefit CSM." *See id.*

Eagle has failed to show that neither Dierker nor CSM has a claim to the $128,000. Although the money was CSM's profits, Dierker testified that it was transferred to his personal account, from which he wrote the check to Eagle for the security deposit. Dierker Dep. 169:21-170:2. Thus, a reasonable jury could conclude that the money no longer belonged to CSM but, rather, to Dierker.

Even if Dierker was acting on CSM's behalf--and the money belonged to CSM--Eagle has not shown that CSM is not entitled to recover the deposit. Whether the $128,000 "benefitted [CSM's]

business"[32] or was lost to Eagle is a question for the jury,

which determines the amount of a plaintiff's actual loss.[33]

Because Eagle has not shown, as a matter of law, that neither

Dierker nor CSM is entitled to recover the $128,000, the Court

must deny summary judgment on this basis.[34]

c. Plaintiffs' Calculation of Lost Profits

Eagle argues that CSM's assertion that it lost about

$644,000 in profits is "unsupported by anything other than

assumptions, speculation, and an incomplete and unreliable

damages calculation." ECF No. 35 at 21. Eagle argues that the

Plaintiffs have "offer[ed] no expert lost profits assessment,"

and Dierker's figure does not "factor [in] costs" or consider

---

[32] *See* ECF No. 35 at 19.

[33] *See AGV Sports Grp., Inc.*, 10 A.3d at 752. The Court notes, however, that "there can be only one recovery of damages for one wrong or injury," even though the Plaintiffs have presented more than one theory of recovery. *See Montgomery Ward & Co. v. Cliser*, 298 A.2d 16, 26-27 (Md. 1972). Thus, if the Plaintiffs prevail, they cannot recover the $128,000 on more than one claim, nor can Dierker and CSM each recover the $128,000 security deposit. *See id.*

[34] The Court also rejects Eagle's argument that Dierker's unjust enrichment claim (Count III)--for which he seeks the $128,000-- must fail on the merits. *See* ECF No. 35 at 18. To prove unjust enrichment, a plaintiff must show, *inter alia*, that the plaintiff conferred a benefit upon the defendant. *Mohiuddin v. Doctors Billing & Mgmt. Solutions, Inc.*, 9 A.3d 859, 865 (Md. Ct. Spec. App. 2010). Eagle argues that the $128,000 security deposit benefitted CSM and, thus, "cannot give rise to any actionable claim for unjust enrichment." ECF No. 35 at 18. As explained, *supra*, however, a jury could find that (1) the $128,000 belonged to Dierker, not CSM, and (2) the money was not used to benefit CSM.

other reasons--such as applicants' failure to meet lending criteria--for the drop in CSM's loan conversion rate. *Id.*

The Plaintiffs counter that Dierker calculated the damages figure "based on [CSM's] historical performance," expert and lay witness testimony, and documentation that "indicate that the decline in the [conversion] rate . . . was caused by Eagle not being able to process borrowers' loans in a timely fashion." ECF No. 42 at 22.  The Plaintiffs contend that whether the "damages are speculative . . . is an issue for the jury to decide." *Id.* at 23.

To be recoverable, damages must be "reasonably certain"[35] and not "based on speculative, remote, or uncertain" figures.[36] Whether claimed damages are "too speculative to be submitted to the jury depends in large measure upon the facts and circum- stances of each particular case." *McAlister v. Carl*, 197 A.2d 140, 146 (Md. 1964).

Eagle has not shown that the Plaintiffs' claimed damages are too speculative to be submitted to the jury. *See McAlister*, 197 A.2d at 146.  Dierker explained that the lost profits figure was based on CSM's historical performance, the average amount CSM earned per loan, and the difference in the conversion rates

---

[35] *See Hoang v. Hewitt Ave. Assocs., LLC*, 936 A.2d 915, 935 (Md. Ct. Spec. App. 2007).

[36] *See DiLeo v. Nugent*, 592 A.2d 1126, 1134 (Md. Ct. Spec. App. 1991).

before and after CSM joined Eagle.   ECF No. 35, Ex. F at 7.   Any alleged flaws in the methodology are the proper subject of cross examination,[37] not the basis for summary judgment.

III. Conclusion

For the reasons stated above, the Court will deny Eagle's motion for summary judgment.

_8/16/12_
Date

William D. Quarles, Jr.
United States District Judge

---

[37] *Cf. Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination" and "presentation of contrary evidence" are "the traditional and appropriate means of attacking shaky . . . evidence.").